UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN S. GORTON AS TRUSTEE OF THE
JOHN S. GORTON SEPARATE PROPERTY
TRUST, DATED 3/3/1993,

Plaintiff,

v.

ADVANCED CELL TECHNOLOGY, INC.,
AND WILMINGTON TRUST, N.A., AS
SPECIAL ADMINISTRATOR OF THE
ESTATE OF WILLIAM MACKAY
CALDWELLl,

Defendants.

## COMPLAINT

## NATURE OF THE ACTION

This is an action brought by John S. Gorton, as Trustee of the John S. Gorton Separate

Property Trust, Dated 3/3/1993 ("Gorton"), against Advanced Cell Technology, Inc. ("ACT")

and Wilmington Trust, N.A. the Special Administrator of The Estate of William Mackay

Caldwell. Until his death on December 13, 2010, William Mackay Caldwell IV ("Caldwell")

acted as the Chairman and Chief Executive Officer of ACT. This action is for violations of the

Securities Exchange Act of 1934 (the "Exchange Act"). In this action, Gorton seeks to recover

damages caused by ACT and Caldwell's violations of federal securities laws in disseminating to

Gorton false and misleading statements in connection with Gorton's purchase of securities from

ACT.

## JURISDICTION AND VENUE

1.      This court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa, by virtue of Plaintiff's claim brought under the provisions of Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10(b)-5, 17 C.F.R. § 240.10-b-5, promulgated thereunder.

2.      Venue is proper in this District pursuant to section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1391(b) and (c) because ACT's principal place of business is within this District in Marlborough, Massachusetts and many of the acts alleged herein, including the preparation and dissemination of false and misleading statements to Gorton and the investing public, occurred in substantial part in this District.

3.      In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## THE PARTIES

4.      Plaintiff Gorton is an ACT shareholder and a citizen of the state of California.

5.      Defendant ACT is a Delaware corporation, with its principal place of business in Marlborough, Massachusetts. Its common stock is registered with the Securities and Exchange Commission (the "SEC") and its shares are traded under the symbol "ACTC." ACT is an early-stage biotechnology company. ACT has been successfully sued on previous occasions for similar breaches of its obligations under warrants and debentures that it has issued to its investors.

6.      Defendant Wilmington Trust, N.A. is the Special Administrator of The Estate of William Mackay Caldwell ("Caldwell Estate"). The Caldwell Estate came into existence upon Caldwell's death on December 13, 2010. Caldwell resided in Los Angeles County, California.

During Gorton's Pricing Period (defined below), Caldwell acted as the Chairman and Chief
Executive Officer ("CEO") of ACT. Caldwell also claimed to fulfill multiple officer level roles at
ACT, including those of Chief Operating Officer, Chief Administrative Officer, and Chief
Financial Officer.

7.    Caldwell, as the Chairman and CEO of ACT, was at all relevant times ACT's
controlling person. Caldwell was responsible for and directed the issuance of all ACT securities
during the relevant times alleged herein.

## FACTUAL BACKGROUND

### *I. THE PRIOR HISTORY BETWEEN THE PARTIES*

8.    Defendant ACT in the present action is not the first entity to bear the name
"Advanced Cell Technology, Inc." In 2001, a predecessor corporation Advanced Cell, Inc. ("the
old ACT") existed that did business under the name Advanced Cell Technology, Inc. The old ACT
was almost entirely controlled by an entity doing business as ACT Group, Inc.

9.    In the early 2000's, the principals of the old ACT sought investors to obtain the
funding necessary to keep the company alive in the face of strong political opposition to human
embryonic stem cell research, upon which ACT's core technology is based. In furtherance of this
financing effort, an officer of the old ACT approached Gorton and solicited his investment.

10.    On or about June 12, 2001, the old ACT executed and delivered a promissory note
(the "Note"), totaling $50,000 to John S. Gorton, as Trustee of the John S. Gorton Separate
Property Trust, Dated 3/3/1993. By its terms, the Note was due and payable on or about December
12, 2001. In addition, the Note was convertible into the common stock of the old ACT upon the
occurrence of certain events, at the option of their holder.

11.     The old ACT defaulted on the Note when it failed to satisfy its obligations under the Note on or before December 12, 2001.

12.     On or about March 19, 2004, Gorton commenced a lawsuit against the old ACT, ACT Group, Inc. and two of those entities' officers in the Worcester Superior Court Department of the Trial Court of the Commonwealth of Massachusetts, C.A. No. 04-0523 (the "'Collection Action"), which sought to collect the $50,000 due and owing pursuant to the Note.

13.     On or about August 25, 2004, Gorton obtained a judgment against the old ACT for damages, interest, and attorneys' fees and costs.

14.     On or about September 29, 2004, Gorton brought a motion to reach and apply the old ACT's primary asset – its controlling interest in ACT, Group, Inc. - in satisfaction of his judgment. After a hearing, the Court entered an order on or about October 14, 2004, expressly prohibiting the old ACT "from transferring any [ACT Group, Inc.] stock without prior leave of Court..."

15.     On information and belief, on or about January 31, 2005, the old ACT caused ACT Group, Inc. to merge with a publicly-traded company called Two Moons Kachinas Corp., which immediately changed its name to ACT Holdings, Inc. ("ACT Holdings"). As part of the merger, the old ACT transferred its stock in ACT Group, Inc. in return for a 30% interest in ACT Holdings.

16.     The transfer by the old ACT of its stock in ACT Group, Inc. in connection with the merger constituted a blatant violation of the Court's October 2004 injunction.

17.     In response to the violation of the October 2004 injunction, on or about February 18, 2005, Gorton filed both a Complaint for Contempt and a motion seeking an injunction to replace the order contemptuously disregarded by the old ACT/ACT Group, Inc.

18.     On or about March 4, 2005, Gorton obtained a temporary restraining order

("TRO") preventing the old ACT from transferring or otherwise disposing of its ACT Holdings

stock. Subsequently, the Court converted the TRO into a preliminary injunction via an order dated

on or about April 1, 2005 (the "Order"). In the Order, the Court ordered that all of the old ACT's

stock interests be placed into escrow "forthwith":

> All shares of A.C.T. Holdings, Inc. beneficially or legally owned or controlled by
> the Defendants ("the Shares") shall be placed *forthwith* into the custody of an
> escrow agent mutually agreeable to the parties, such agreement not to be
> unreasonably withheld. In the absence of such agreement, the Shares are to be
> conveyed to counsel for the Plaintiffs to be held in escrow until the underlying
> Judgment of the Plaintiffs is satisfied and subject to the remaining provisions of
> this order.

Order, ¶ 1 (emphasis supplied).

19. Immediately upon entry of the Order, the old ACT/ACT Group, Inc. embarked on a

calculated campaign to avoid the establishment of the court-ordered stock escrow. During the

week following the issuance of the Order, opposing counsel evaded all attempts by Gorton's

counsel to commence a dialogue on the stock escrow. On or about Friday, April 8, 2005, they

finally agreed to the appointment of Gorton's counsel as escrow agent and requested the drafting

of an escrow agreement.

20. Gorton's counsel drafted the requested escrow agreement and transmitted it to opposing

counsel on or about Monday, April 11, 2005. However, the old ACT/ACT Group, Inc. again failed

to respond to Gorton's contacts, ignoring multiple telephone inquiries and letters sent by the

Gorton's counsel during the week of April 11th.

21. On or about April 14, 2005, rather than setting up the stock escrow as required by the

Order, the old ACT/ACT Inc. sought reconsideration of the Order. Gorton opposed the

reconsideration motion on several grounds, including belief that such motion was based upon a

perjurous affidavit and that it was nothing more than a delay tactic to avoid the Order's escrow mandate.

22. On or about April 20, 2005, Gorton sought redress for the old ACT's/ACT Inc.'s steadfast refusal to comply with the Order's escrow mandate via the filing of a second contempt complaint and a motion seeking sanctions.

23. By order dated on or about May 6, 2005, the Court denied the motion for reconsideration (thus reaffirming the Order) while stating that it was "perplexed as to the reasons for the Defendants' failure to have complied with the Court's Order of April 1, 2005."

24. The Court's reaffirmation of the Order ultimately led to the settlement of the Collection Action. By this time, Gorton's securities, which held priority over equity and certain other debt investors, had thereby increased substantially in value. The parties reached a resolution of the Collection Action; this was memorialized in a Settlement Agreement dated September 14, 2005. The parties to the Settlement Agreement included Gorton, ACT Group, Inc., Advanced Cell, Inc. [the old ACT] and Advanced Cell Technology, Inc. [ACT], formerly known as ACT Holdings, Inc. That Settlement Agreement and certain documents attached thereto and executed therewith, are at the heart of the present dispute.

## II. THE AGREEMENT BETWEEN THE PARTIES

25.   As provided by the September 14, 2005 Settlement Agreement, a copy of which is attached as Exhibit "A" and is incorporated by this reference, ACT executed and delivered a Warrant to Purchase Shares (the "Warrant Agreement"). To compensate Gorton for his loss of priority, the Warrant Agreement provided Gorton with various rights, including rights to purchase stock in ACT and also protective rights to receive additional stock-purchase rights and stock, based upon lower-priced securities transactions by ACT with third parties.

26.   Pursuant to the terms of the Warrant Agreement, a copy of which is attached as Exhibit

"B" and is incorporated by this reference, subject to the adjustment provisions specified therein,

Gorton initially had the right to purchase 46,970 shares of ACT's common stock at a price of $2.20

per share during the period of May 1, 2005 through January 15, 2009, referred to as the "Pricing

Period."

27.   The Warrant Agreement contained provisions for automatic adjustment to the number

and price of shares that could be purchased thereunder, prior to the exercise of the Warrant

Agreement, in Section 3, which provided:

> 3. ADJUSTMENT OF WARRANT PURCHASE PRICE AND NUMBER OF
> SHARES. The Warrant Purchase Price shall be subject to decrease and the
> number of shares purchasable upon the exercise of this Warrant shall be subject to
> increase from time to time upon the occurrence of certain events and/or price
> determinations described in this Section 3. Upon each decrease of the Warrant
> Purchase Price per share of Common Stock, if any, the Holder of this Warrant
> shall thereafter be entitled to purchase, at the Warrant Purchase Price resulting
> from such adjustment, the number of Equity Units obtained by multiplying the
> Warrant Purchase Price per share of Common Stock in effect immediately prior to
> such adjustment by the number of shares purchasable pursuant hereto
> immediately prior to such adjustment, and dividing the product thereof by the
> Warrant Purchase Price per share of Common Stock resulting from such
> adjustment.

> 3.1  Issues of Equity Securities, If and whenever during the Pricing Period, the
> Company shall issue or agree to issue any Equity Units or other securities, other
> than Excluded Units (as defined below), for a consideration per share or providing
> for a conversion or an exercise price per share which is less than the Warrant
> Purchase Price in effect immediately prior to such issue, the Warrant Purchase
> Price shall be reduced to the per-share price applicable to such issuance. The fair
> market value of each such share and security of which an Equity Unit is
> comprised shall be determined by the Company's Board of Directors in good
> faith; provided, that the Holders may appeal any such determination to an
> Arbitrator as provided for herein. Each such adjustment of the Warrant Purchase
> Price shall be calculated to the nearest one tenth of a cent. For the purposes of this
> Subparagraph, the following clauses shall also be applicable:

> (1)  Convertible Securities, Options, and Rights. If the Company shall issue any
> stock, security, obligation, option, or other right which directly or indirectly may
> be converted, exchanged, or satisfied in shares of Common Stock, the maximum

total number of shares of Common Stock issuable upon exercise of such rights shall thereupon be deemed to have been issued and to be outstanding, and the consideration received by the Company therefore shall be deemed to include the sum of the consideration received for the issue of such rights and the minimum additional consideration payable upon the exercise of such rights. No further adjustment shall be made for the actual issuance of Common Stock upon the exercise of any such right. If the provisions of any such rights with respect to purchased price or shares purchasable shall change or expire, any adjustment previously made hereunder for such rights shall be readjusted to such as would have obtained on the basis of the rights as modified by such change or expiration, but only to the extent that Holder suffers no detriment thereby.

(2) For purposes of this Agreement, the term "Excluded Units" shall mean shares of Common Stock or options therefore issued to, exercised or purchased by directors, officers, employees or consultants of the Company in connection with their service as directors of the Company, their employment by the Company or their retention as consultants by the Company, in each case authorized by the Board of Directors and issued pursuant to the Company's 2004 Stock Option Plans and 2005 Stock Incentive Plans or any other such option plan approved by vote of a majority of the independent members of the Board of Directors of the Company.

(Collectively "Pre-Exercise Adjustment Provision")

28.   The Warrant Agreement's adjustment protection applied whenever ACT issued

"Equity Units or other securities" at a lower per share price than that offered to Gorton. The

term 'Equity Unit' is defined in the Warrant Agreement:

The term 'Equity Unit' shall include Common Stock or Preferred Stock, either alone or issued, offered or sold together as an integrated investment unit with any warrants or similar non-debt securities convertible or exchangeable directly or indirectly into Common Stock or Preferred Stock.

29.   The Warrant Agreement obligated ACT to notify Gorton whenever Equity Units

or other securities were issued to third parties with terms that triggered Gorton's adjustment

protection:

3.5 Notices of Change.
(a) Immediately upon any adjustment in the number or class of shares subject to this Warrant and of the Warrant Purchase Price, the Company shall give written

notice thereof to the Holder, setting forth in reasonable detail and certifying the calculation of such adjustment.

(b) The Company shall give written notice to the Holder at least fifteen (15) business days prior to the date on which the Company closes its books or takes a record for determining rights to receive any dividends or distributions.

(c) The Company shall also give written notice to the Holder at least 30 business days prior to the date on which an Organic Change shall take place; provided, however, no such notice is required in the event the Organic Change involves a merger or consolidation effected for the primary purpose of changing the State of organization of the Company.

30.    After the exercise of the Warrant Agreement and during the Pricing Period, the

number of additional shares to be issued to Gorton under the Warrant Agreement was subject to

further adjustments, as described in the following provision:

If, at any time (and on each time) between May 1, 2005 and January 15, 2009 (the "Pricing Period"), after the exercise of any or all of the Warrants hereunder, the Company issues any Equity Units other than Excluded Units (as defined below), and the effective per share purchase price of Common Stock represented by such Equity Units (the "Effective Price") being issued is lower than the Warrant Purchase Price paid in connection with such prior exercise, then the Company shall issue to the Holder sufficient additional Equity Units (of the same security(ies) that was (were) previously issued to the Holder upon the previous exercise of the Warrant) such that the total number of Equity Units issued to the Holder equals the number of determined by multiplying 46,970 by a fraction, the numerator of which is $2.20 and the denominator of which is the Effective Price, as the same may be amended.

("Post-Exercise Adjustment Provision")

## SUBSTANTIVE ALLEGATIONS

31.    During the Pricing Period, ACT failed to properly disclose the issuance of Equity

Units with terms that triggered Gorton's adjustment protections under the Pre-Exercise and Post-

Exercise Adjustment Provisions. To the extent that ACT did disclose such transactions, it

fraudulently mischaracterized the terms thereof.

32.     On or about August 25, 2006 Gorton submitted a Subscription Agreement to ACT (a copy of which is attached as Exhibit "C" and is incorporated by this reference), wherein he elected to exercise the purchase rights represented by the Warrant Agreement and to purchase shares of common stock under the "Net Issue Exercise" provision in Section 1.2 of the Warrant Agreement.

33.     On or about August 25, 2006 in accompaniment with the Subscription Agreement, Gorton sent a letter to Caldwell, a copy of which is attached as Exhibit "D" and is incorporated by this reference, expressing his intent to immediately exercise his stock purchase rights under the Warrant Agreement. The letter stated:

> Under the terms of the Warrant (e.g., Section 3.5 (a)), ACT is obligated to provide me with notice of adjustment of the Warrant price. I believe ACT is in breach of that obligation. Based on the best publicly available information I could find, I have made my own calculations related to the Adjustment. If you have any better information or any objections to my calculations, please e-mail me immediately. I am reserving all of my rights with respect to ACT's failure to notify me of adjustments as required by the terms of the Warrant.

34.     Gorton's calculations for the exercise of his Warrant Agreement were based upon the terms of the Warrant Agreement and ACT's public filing of Prospectus Supplement No. 3 To Prospectus Dated April 13, 2006, a copy of which is attached as Exhibit "E" and is incorporated by this reference, wherein ACT reported:

> We elected to make the monthly redemption payments due on August 1, 2006 under of our convertible debentures maturing September 14, 2008, in shares of our common stock. In accordance with the terms of the convertible debentures, the deemed issue price per share will be calculated at the lesser of (1) the Conversion Price (as defined in the convertible debenture) or (2) 85% of the average of the 10 closing prices immediately prior to the applicable monthly redemption date.

35.     The monthly redemption payments made by ACT on or about August 1, 2006, were in satisfaction of convertible debentures issued on or about September 15, 2005 at a price of $2.30 per share. ACT's closing prices in July of 2006 were lower than the initial per share price of the convertible debenture.

36.     Gorton applied the formula as provided for under the Warrant Agreement, by averaging the ten closing prices immediately prior to the applicable monthly redemption date, on or about August 01, 2006, and multiplying that value by a fraction to reflect eighty five percent of the averaged amount, ultimately arriving at a price per share of $0.4174, which required the issuance of 192,686 shares of ACT's common stock.

37.     After several days of inaction by ACT, on or about August 29, 2006, Gorton sent a letter to Caldwell, a copy of which is attached as Exhibit "F" and is incorporated by this reference, requesting a status update about the progress of the adjustment, issuance and registration of shares owed under his exercised Warrant Agreement.

38.     Caldwell responded in a letter, a copy of which is attached as Exhibit "G" and is incorporated by this reference, sent on or about August 29, 2006, stating that:

> Appropriate adjustments will be made in your warrant exercise price and we will be forwarding the notice required under section 3.5(a) of your warrant setting forth the calculation of the adjustment in short order. We appreciate your patience as we see to the closing of the transaction giving rise to the adjustment.

39.     The statement by Caldwell to Gorton failed to state material facts which were required under the notice provision of the Warrant Agreement.

40.     By September 12, 2006, Gorton had not received the pledged notice from ACT nor had the company issued Gorton any of the shares owed from his exercise of the Warrant Agreement.

41.     On or about September 12, 2006, in reviewing the public filings, Gorton

discovered the existence of another event that triggered the adjustment rights under the Warrant

Agreement. As published in ACT's 8-K/A, a copy of which is attached as Exhibit "H" and is

incorporated by this reference, filed with the SEC on or about September 11, 2006, and certified by

Caldwell:

> The debentures [per the Defendant's 2005 Securities Purchase Agreement] are
> initially convertible into 38,129,340 million shares of common stock at a price of
> $0.288 per share.

42.     ACT failed to provide Gorton with individual notice that these additional events

had transpired and that the price of the debentures clearly triggered adjustment to the number of

shares owed under Gorton's Warrant Agreement.

43.     Following this discovery, on or about September 13, 2006, Gorton sent a letter, a

copy of which is attached as Exhibit "I" and is incorporated by this reference, to Caldwell

demanding an adjustment to the shares owed pursuant to the Post-Exercise Adjustment provision

of the Warrant Agreement. The demand read in part:

> Today . . . I learned of a more recent transaction, dated only yesterday that further
> affects our rights to receive stock. I am referring to the transaction announced
> 9/11/2006 that provides, in part: 'The debentures are initially convertible into
> 38,129,340 million shares of common stock at a price of $0.288 per share.' This
> transaction invokes the following post-exercise anti-dilution paragraph of my
> Warrant. . . . Please immediately send 358,799 shares of Advanced Cell
> Technology, Inc. stock, in my name, as the trustee of my trust.

44.     On or about September 27, 2006, Gorton reviewed a demand letter sent by

another ACT investor Gary D. Aronson ("Aronson"), a copy of which is attached as Exhibit "J"

and is incorporated by this reference, to ACT's Senior Vice President and General Counsel, Jon

Atzen ("Atzen") and to ACT's Counsel Chris Howard ("Howard") reiterating Aronson's demand

for the shares owed since the date Aronson and Gorton concurrently exercised on August 25, 2006

and noting the severe drop in the stock price during the period of ACT's delay.

45.     In Aronson's September 27, 2006 correspondence, he requested that ACT provide

a schedule detailing the relevant adjustment transactions that ACT had entered into:

> With respect to the schedule of relevant transactions, I would like it to include all
> transactions, even those that were not disclosed in SEC documents, since my
> Warrant contains no such limitation. I wanted to emphasize several additional
> points: 1) The relevant Pricing Period for transactions is not after the date of my
> Warrant, to which you both refer. It runs from May 1, 2005 through January 15,
> 2009; 2) Warrants, Options, Debentures or "other securities" of any type qualify
> for Adjustment, not just Equity Units; 3) They qualify if they are either issued or
> agreed to be issued by ACT during the Pricing Period . . . Please be sure to
> include in your schedule reference to transactions and issues on the attached list.

## I. ACT MADE MATERIAL OMISSIONS AND DISSEMINATED MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING THE NUMBER AND PRICE OF SHARES PURCHASABLE UNDER THE WARRANT AGREEMENT.

46.     On or about September 27, 2006, Gorton received electronic correspondence from

ACT, a copy of this letter is attached as Exhibit "K" and is incorporated by this reference, which

explicitly warranted that ACT had not issued shares below $0.288 per share:

> Please note that ACT is providing an explicit representation and warranty
> regarding the fact that it has not issued any securities during the pricing period at
> a price less than $0.288 per share. These provisions are set forth in new Section 2
> of the Release. This approach should address your concerns regarding issuance of
> shares below the $0.288 level without necessity of the additional work involved in
> producing schedules. If there are specific transactions that are of concern to you,
> please let us know. It should suffice to say that no transactions even approach the
> $0.288 per share price underlying your anti-dilution adjustment. In direct response
> to your specific questions -- the Trilogy warrant was issued at a strike of $2.54
> and the director shares were all issued under the Company's option plan.

47.     This statement by ACT to Gorton omitted and/or misrepresented material facts,

that ACT had in fact issued securities during the Pricing Period at prices below $0.288 per share,

which were required to be communicated to Gorton under the notice provision of the Warrant Agreement.

48.     While reserving all of his rights with respect to undisclosed transactions, in reliance on ACT's representation and after further review of ACT's public filings, which were certified by Caldwell, which did not reveal additional events requiring adjustment to the number of shares owed under his Warrant Agreement, on or about October 19, 2006, Gorton accepted the transfer of 358,799 shares from ACT. This transfer included the shares purchased by Gorton through the exercise of his Warrant Agreement.

## II. ACT CONCEALED THE OCCURRENCE OF A TRANSACTION BETWEEN THE COMPANY AND GUNNAR ENGSTROM AND MATERIALLY MISCHARACTERIZED THE TERMS THEREOF.

49.     Unbeknownst to Gorton, on or about May 09, 2005, during the Pricing Period, ACT executed and delivered a warrant to Gunnar Engstrom, ACT's former Chief Financial Officer, for the purchase of ACT's shares at the price of $0.25 per share ("Engstrom Transaction").

50.     On or about May 05, 2005, electronic communications, copies of which are attached as Exhibit "L" and are incorporated by this reference, between Howard and other top ACT executives, including Caldwell, instruct ACT's employees to backdate the Engstrom warrant to November 30, 2004.

51.     On or about May 09, 2005, ACT's employees carried out Mr. Howard's request by back-dating the Engstrom warrant.

52.     On or about May 09, 2005, Howard, ACT's attorney, addressed a letter, a copy of which is attached as Exhibit "M" and is incorporated by this reference, to Mr. Engstrom, enclosing the back-dated warrant and acknowledging that the warrant had been backdated to November 30, 2004.

53.    The backdating process had the effect of allegedly removing the Engstrom Transaction from Gorton's bargained-for Pricing Period and concealing the true Engstrom warrant issuance date of May 09, 2005 from ACT's shareholders.

54.    The Engstrom warrant itself bears clear documentary evidence of its revision and backdating. The original issuance date, above Caldwell's signature, is crossed out, and the "November 30, 2004" date has been added beside the strikethrough in markedly different font.

55.    ACT never provided Gorton with the required notice of the $0.25 warrant issued under the Engstrom Transaction.

56.    It was not until on or about March 31, 2006, when ACT filed its annual 10-KSB with the SEC, that ACT publicly disclosed the Engstrom Transaction.

57.    ACT's report contained false and misleading statements about the issuance date and terms of the Engstrom Transaction. A copy of the annual 10-KSB is attached as Exhibit "N" and is incorporated by this reference, The annual report stated:

> On November 30, 2004, we granted warrants to purchase 100,000 shares of common stock at a per share price of $0.25 to a former executive of the company in connection with the termination of his employment contract. The warrants are exercisable on or after April 1, 2005 and lapse if unexercised on April 1, 2010.

("Engstrom Disclosure").

58.    In the Engstrom Disclosure, ACT misrepresented the date on which the Engstrom warrant was issued. The true but concealed fact is that the warrant issued by ACT to Mr. Engstrom was issued on May 9, 2005 during Gorton's pricing period and that warrant was unlawfully backdated to the November 30, 2004 date cited in ACT's public documents.

59.    Howard and Caldwell, who participated in the backdating process, had actual knowledge of the circumstances surrounding the re-dating of Engstrom's warrant and later falsely warranted to Gorton that no lower priced share issuances had occurred before his exercise.

60.   There is a high probability that ACT mischaracterized the material facts regarding the

Engstrom Transaction with an intent to defraud Gorton because:

        a.      The fraudulent misrepresentation enabled ACT to avoid its contractual

                obligations to Gorton.

        b.      By backdating the warrant under the Engstrom Transaction to the earlier

                date of November 30, 2004, ACT could disguise the discount from fair

                market value at which the Engstrom Warrant was granted.

        c.      On or about November 30, 2004, ACT was not a publicly traded company.

                As a result, it was easier for ACT to mischaracterize the value of shares

                granted under the warrant since they would lack readily ascertainable fair

                market value for the purposes of corporate accounting. On or about May

                09, 2005, ACT's stock closed at a price of $2.73. The $0.25 per share

                price granted to Engstrom on the 2005 date is a fraction of the fair market

                value of the publicly traded shares and should have been accounted for as

                a compensation expense. The intrinsic value of the underpriced warrant

                provided to Mr. Engstrom was approximately $124,000.00.

        d.      ACT's disclosures pertaining to the Engstrom Transaction and the

                concealment thereof, allowed the company to escape scrutiny and to avoid

                administrative and/or litigation proceedings for potential violations of

                securities laws, including: engaging in a transaction that defrauds

                purchasers in violation of Section 17 of the Exchange Act of 1933, 15

                U.S.C. § 77q(a); commission of securities fraud in violation of Section

10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10-b-5; dissemination of false and misleading proxy solicitations as prohibited by Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, 15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a-9; and falsification of accounting records in violation of Section 13(b) of the Exchange Act, SEC Rule 13b2-1 and SEC Rule 13b2-2 promulgated thereunder, 15 U.S.C. § 78m(b), 17 C.F.R. § 240.13b2-1 and 17 C.F.R. § 240.13b2-2.

e.     ACT's disclosures pertaining to the Engstrom Transaction and the concealment thereof, allowed Caldwell personally to escape scrutiny and to avoid administrative and/or litigation proceedings for his role in aiding and abetting ACT's potential violations of securities laws actionable under SEC Rule 13a-14, 17 C.F.R. § 240.13a-14, since Caldwell certified ACT's SEC reports.

f.     ACT's valuation methods relating to the Engstrom Transaction further demonstrate that it acted with the requisite fraudulent intent to misrepresent the terms of the Engstrom Warrant.

g.     In Exhibit 99.1 to ACT's 8-K/A, a copy of which is attached as Exhibit "O" and is incorporated by this reference, filed on or about April 18, 2005, ACT valued the Engstrom Warrant at $0, using the Black Scholes pricing model.

h.     The SEC twice questioned the valuation method utilized by the ACT in communications dated on or about July 15, 2005 and on or about August

11, 2005. SEC Form Corres. filed 07/15/2005, pp. 6-7; SEC Form Corres. filed 08/11/2005, pp. 2-4. Copies of the SEC Form Correspondence have been attached as Exhibits "P" and "Q."

i.      ACT never utilized SEC-mandated Generally Accepted Accounting Principles valuation methods, as prescribed in Financial Accounting Standard 123 (Revised), for the Engstrom Warrant and never corrected the valuation for the Engstrom Warrant, even after Engstrom's exercise of the warrant whereby he received shares at a significant discount from fair market value. ACT reported in its Form 10-KSB, a copy of which is attached as Exhibit "R" and is incorporated by this reference, filed on or about March 31, 2006 that the value of the warrant was not: separable from the overall severance package; these warrants were exercised during October 2005, resulting in the issuance of 90,566 common shares; therefore, the Company has utilized a Black Scholes analysis as the most readily determinable measure of value. The warrants have been valued at $0, using the Black Scholes pricing model.

## III. ACT RESTATED THE MATERIALLY FALSE STATEMENTS REGARDING THE NUMBER AND PRICE OF SHARES PURCHASABLE UNDER THE WARRANT AGREEMENT, PROVIDING ADDITIONAL SUPPORT THAT ACT'S ACTIONS WERE UNDERTAKEN WITH FRAUDULENT INTENT.

61.      On or about October 16, 2006, ACT's General Counsel sent a letter to Gorton, a copy of which is attached as Exhibit "S" and is incorporated by this reference alleging that "excess shares" had been issued to Gorton in the transfer that occurred on or about October 04, 2006 and notifying him that ACT intended to cancel 54,909 "incorrectly issued" shares.

62.     The statement made by ACT to Gorton on October 16, 2006, repeated untrue statements of material fact and failed to state material facts required to be stated therein.

63.     In the calculations attached to the October 16th correspondence, ACT reiterated the false representation to Gorton that no lower priced transactions had occurred as of the date of the correspondence. The "New pre-exercise Anti-diluted price strike" is listed "as calculated" at $0.2880 and is listed as "corrected" at $0.288.

64.     The straight-forward application of the Warrant Agreement formula actually entitled Gorton to more shares than he had received in the transfer on or about October 04, 2006; ACT ultimately abandoned its effort to cancel Gorton's shares.

## FIRST CLAIM FOR RELIEF

(Against ACT for Misrepresentation and Omission in Violation of Section 10 (b) of the Exchange Act and Rule 10b-5)

65.     Gorton repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     ACT and Caldwell participated in transactions and negotiations with Gorton and third parties to whom ACT issued Equity Units, in which these parties utilized telephonic conferences, correspondence by the United States mail and other instrumentalities of interstate commerce.

67.     At the time of the transactions mentioned hereinafter, ACT was publicly traded over the counter in the United States.

68.     ACT and Caldwell's false and misleading statements and omissions were intended to and did, as alleged herein, (i) deceive Gorton; and (ii) cause Gorton to exercise his Warrant Agreement to purchase ACT's securities at an inflated price.

69.     Caldwell and ACT were individually and collectively responsible for making one or more of the statements and omissions alleged herein, by virtue of having prepared, reviewed, commented on, approved, signed, and/or disseminated documents which contained false and/or misleading statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

70.     ACT and Caldwell made the false and/or misleading statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Gorton who purchased and sold ACT's common stock during the Pricing Period.

71.     Despite the representation and warranty made by ACT and Caldwell that "no transactions even approach the $0.288 per share price underlying your [plaintiff's] anti-dilution adjustment," ACT had issued shares in the Engstrom Transaction at a strike price of $0.25 on or about May 09, 2005, below the $0.288 price to which Gorton's Warrant Agreement was adjusted.

72.     ACT and Caldwell's false and/or misleading statements and omissions were made in connection with the purchase or sale of ACT's securities.

73.     The omissions and misrepresentations made by ACT and Caldwell over the course of Gorton's Pricing Period, created a material misimpression where, under all facts known or reasonably available to Gorton at the time of exercise and at the time of post-exercise adjustment demands, no lower per share issuances had been transacted with third parties.

74.     Gorton based his exercise and adjustment decisions on the statements made directly to him by ACT and on the statements made by ACT in its SEC disclosures.

75.     In sworn statements made in a prior action between the parties, ACT admitted that Gorton *should* be able to rely on the disclosures set forth in its public filings. In Defendants' Response to Plaintiff's Form Interrogatories- General Set One Request for Admission No. 10, a copy of which is attached as Exhibit "T", ACT stated: "All securities issued from May 1, 2005 through present are identified in ACT's public securities filings from May 1, 2005 to the present."

76.     Thus, based on the false statements made by ACT and Caldwell to Gorton directly, in violation of ACT's duty to disclose under the Warrant Agreement, as well as the false and misleading statements that ACT published in the public domain, Gorton justifiably relied upon and was deceived by the above omission of material facts.

77.     In ignorance of the false and misleading nature of ACT and Caldwell' statements and omissions, and relying directly or indirectly on those statements, Gorton purchased or otherwise acquired ACT's common stock at inflated prices during the Pricing Period. But for the fraud committed by ACT and Caldwell, Gorton would not have purchased these securities at inflated prices.

78.     Had ACT provided Gorton with the true and accurate information about the Engstrom Transaction, the lower price per share issuance that had triggered his adjustment rights prior to exercise, Gorton would have exercised the Warrant Agreement at the lowest per share price that had been disclosed at the date of exercise.

79.     Applying the formula provided for in the Warrant Agreement, ACT should have granted Gorton the right to purchase 366,366 additional shares using the $0.25 price per share that ACT granted in the Engstrom Transaction.

80.     Had ACT and Caldwell provided Gorton with the true and accurate information about the lower per share issuances that had triggered his adjustment rights subsequent to exercise, Gorton would have demanded the transfer of the additional shares owed. The shares issued to Gorton in adjustment were a mere fraction of those owed to him.

81.     Gorton was substantially damaged as a direct and proximate result of his purchase of ACT's securities at inflated prices and the subsequent decline in the price of those securities by the time the truth was revealed.

82.     Gorton is entitled to recover damages in an amount to be determined at trial, but believed to be approximately $1,384,181.

83.     By reason of ACT and Caldwell's misrepresentations and omissions concerning the occurrence and facts surrounding the price per share of third party issuances, ACT violated Section 10 (b) of the Exchange Act and SEC Rule 10(b)-5, 17 C.F.R. § 240.10-b-5.

## **SECOND CLAIM FOR RELIEF**

(Against Wilmington Trust, N.A. as Special Administrator of the Estate of William Mackay Caldwell, for Violation of §20(a) of the Exchange Act).

84.     Gorton repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

(a) At all relevant times, Caldwell participated in the operation and management of ACT, and conducted and participated, directly and indirectly, in the conduct of ACT's business affairs. Because of Caldwell's senior positions in a small corporation, he knew the adverse non-public information about ACT's issuances of securities. This information includes: (i) negotiating and approving the execution of the Engstrom Transaction and failing to disclose said transaction as required per the Warrant Agreement; (ii) causing ACT's counsel to provide a false representation

and warranty to Gorton that ACT had not issued any security instruments at a price lower than $0.288 per share, when in fact securities had been issued below this price. Because of his leadership position with the company, Caldwell had access to adverse non-public information and was required to disclose these facts promptly and accurately to ACT shareholders, including Gorton, and the financial markets but failed to do so.

(b) As the Chief Executive Officer and the Chairman of the Board of Directors of a publicly owned company, in addition to numerous other titles, Caldwell had a duty to disseminate accurate and truthful information with respect to ACT's financial condition and results of operations, and to correct promptly any public statements issued by ACT which had become materially false or misleading. Caldwell personally certified all public documents filed with the SEC during Gorton's Pricing Period.

(c) Because of his positions of control and authority as the CEO and Chairman of the Board of Directors at ACT, in addition to numerous other titles, Caldwell was able to, and did, control the contents of the various reports, press releases, and public filings that ACT disseminated in the marketplace during the Pricing Period concerning the ACT's results of operations. Throughout the Pricing Period, Caldwell exercised his power and authority to cause ACT to engage in the wrongful acts complained of herein. Caldwell, therefore, was a "controlling person" of ACT within the meaning of §20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which misrepresented and omitted disclosure of the equity issuances alleged herein.

85.    Caldwell, therefore, acted as a controlling person of ACT within the meaning of §20(a) of the Exchange Act. By reason of his multiple senior management positions, including, President, Chief Executive Officer and Chairman of the Board of Directors of ACT, Caldwell had the power to direct the actions of ACT, and exercise the same to cause ACT to engage in the unlawful acts and conduct complained of herein. Caldwell exercised control over the general operations of ACT and possessed the power to control the specific activities that comprise the primary violations about which Gorton complains.

86.    By reason of the above conduct, Wilmington Trust, N.A. as Special Administrator of The Estate of William Mackay Caldwell is liable pursuant to §20(a) of the Exchange Act for the violations of ACT.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff John S. Gorton, as Trustee of the John S. Gorton Separate Property Trust, Dated 3/3/1993 prays that the Court enter judgment against Defendant Advanced Cell Technology, Inc. and against Defendant Wilmington Trust, N.A. as Special Administrator of William Mackay Caldwell as follows:

A.  On the First Claim for Relief, for damages in an amount to be determined at trial; and

B.  On the Second Claim for Relief, for damages in an amount to be determined at trial;

C.  Awarding plaintiff reasonable costs and expenses incurred in this action, including counsel fees and other disbursements; and

D.  Granting any further and different relief that the Court deems just and proper.

### PLAINTIFF REQUESTS A TRIAL BY JURY

Respectfully submitted,

JOHN S. GORTON

By one of his attorneys,

/s/ Lauren J. Coppola
Daniel C. Reiser (BBO# 638204 )
Lauren J. Coppola (BBO# 666211)
Craig and Macauley
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788
*LOCAL COUNSEL*

Jeffrey A. Feasby
 (pro hac vice motion to follow)
Luce Forward Hamilton Scripps, LLP
600 West Broadway Suite 2600
San Diego, CA 92101
(619) 236-1414
California -Bar # 208759
*LEAD COUNSEL*